## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

SANKET VYAS, as liquidating agent
for and on behalf of Q3 I, L.P.,

     Plaintiff,                       Case No.:   8:22-cv-1515

v.

TAGLICH BROTHERS, INC., and
TAGLICH PRIVATE EQUITY, LLC,

     Defendants.

_____/

## COMPLAINT

Plaintiff, Sanket Vyas ("Vyas"), as liquidating agent for and on behalf of Q3 I, L.P. ("Q3I"), sues Defendants, Taglich Brothers, Inc. ("Taglich Brothers") and Taglich Private Equity, LLC ("Taglich Private Equity") (collectively, "Taglich" or "Defendants"):

### SUMMARY OF THE CASE

1.     Q3I is a limited partnership that was formed to facilitate and formalize a cryptocurrency trading club (the "Q3 Trading Club").

2.     An individual named Michael Ackerman (alternatively, "Ackerman") defrauded Q3I, causing it to lose the vast majority of the $35 million paid into Q3I by the limited partners. Ackerman has plead guilty to criminal fraud, admitting that

he acted alone to victimize Q3I, its limited partners, and its general partner, Q3 Holdings, LLC ("Q3 Holdings").

3.    Ackerman accomplished his fraud by reporting false returns in the crypto exchange accounts to Q3I and then using those false returns to take unearned "profits" from Q3I pursuant to a profit participation agreement. In truth, Ackerman was not taking any profit, and he was stealing the limited partners' deposits.

4.    Ackerman was able to conduct his scheme because of the negligence of enablers.

5.    Pertinent to this case, Q3I hired Denis McEvoy ("McEvoy) – a Chartered Financial Analyst employed by Taglich and who at all times appeared to be acting on its behalf – as its fund administrator. McEvoy was supposed to protect Q3I from schemes like Ackerman's, but instead did nothing. Q3I paid McEvoy a hefty fee for his oversight duties, but in turn, McEvoy negligently performed his protective duties to Q3I, permitting Ackerman to perpetuate a fraud that should have died on the vine as soon as McEvoy was retained.

6.    Neither McEvoy nor anyone else at Taglich ever verified the balance of the cryptocurrency held by Q3I in the exchanges, though they clearly had the right and duty to do so to protect Q3I. If they had verified the balance, they would have immediately known that Ackerman was defrauding Q3I and could have stopped the scheme before the vast majority of the money was stolen.

## PARTIES, JURISDICTION, AND VENUE

7.      Plaintiff Vyas, as liquidating agent for and on behalf of Q3I, is a resident of New Orleans, Louisiana. Pursuant to Del. Code tit. 6, § 17-803, and/or section 9.02(c) of the Q3I Limited Partnership Agreement, Vyas has been appointed as the liquidating agent of Q3I to wind up Q3I's affairs and marshal and liquidate its assets for and on Q3I's behalf, including the liquidation of the claims in the instant case.

8.      Nonparty Q3I is a Delaware limited partnership with its principal place of business in Saint Petersburg, Florida.

9.      Nonparty Q3I is managed by its general partner, nonparty Q3 Holdings. Q3 Holdings is a Delaware limited liability company with its principal place of business in St. Petersburg, Florida. Q3 Holdings was at all relevant times managed by a board of managers composed of Dr. Quan Tran ("Tran"), James Seijas ("Seijas"), and Ackerman.

10.     Defendant Taglich Brothers is a New York corporation with its principal place of business in Cold Spring Harbor, New York.

11.     Defendant Taglich Private Equity, LLC is a Delaware limited liability company with its principal place of business in New York County, New York.

12.     Nonparty McEvoy was at all relevant times an employee, either directly or through his personal LLC, of Taglich. McEvoy's acts and omissions that give rise

to the causes of action herein were performed on behalf of Taglich and for Taglich's benefit.

13.    This Court has subject matter jurisdiction pursuant to 28 U.S. Code § 1332(a)(1) because Plaintiff and Defendants reside in different states and the amount in controversy exceeds $75,000.00.

14.    This Court has specific personal matter jurisdiction over Taglich pursuant to Fla. Stat. § 48.193 because Taglich, through McEvoy, committed tortious acts directed to Q3I in the State of Florida, and caused injury to Q3I in the State of Florida, all of which give rise to the claims brought herein.

15.    Venue is appropriate in this Court pursuant to 28 U.S. Code § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred in this venue.

## GENERAL ALLEGATIONS

16.    Tran, Seijas, and Ackerman formed an informal crypto trading club in 2017. Ackerman purported to develop and use a proprietary and wildly successful algorithm in the cryptocurrency exchanges to trade on the volatility of cryptocurrency. In truth, there was no such algorithm. Ackerman merely tricked the trading club by maintaining sole access to the exchange accounts and reporting false returns. To hide what he was doing from Tran and Seijas, Ackerman sent them doctored screenshots of the account balances in the cryptocurrency trading accounts

held at the exchanges. This made it falsely appear that significant profits had been earned on the money transferred to those accounts.

17.     For the trading club to work, it needed a bank to accept deposits in US Dollars from its participants that it could sweep into the exchanges to acquire cryptocurrency to trade. Tran had originally been using his personal account at Wells Fargo to facilitate the trading club. When Wells Fargo eventually discovered Tran's use of the account for that purpose, it closed the account. Due to the high-risk nature of cryptocurrency trading, Wells Fargo and many other banks refused to take the risk that comes with the use of its accounts to facilitate a cryptocurrency trading fund. When Signature Bank stated that it would, it noted it would only do so if a formal entity was created to protect the participants.

18.     In 2018, Q3I was created to formalize the informal trading club. Q3I would take deposits in real currency from limited partners, give them a proportional limited partnership interest in Q3I, and then (theoretically) sweep their deposits into cryptocurrency exchanges.

19.     Soon after Q3I was created as an entity, in or about September 2018, Q3I retained McEvoy – a Chartered Financial Analyst who worked for Taglich and who Q3I believed to be acting on behalf of Taglich – to serve as the fund administrator.

20.     Taglich Brothers and its private equity arm, Taglich Private Equity, are a mid-sized financial services firm that provides advice to investors and administer investment funds.

21.     At all relevant times, McEvoy, through his personal LLC and/or individually, was employed by Taglich.

22.     Moreover, according to information provided by Tran, Q3I believed that McEvoy was fully backed by Taglich when he was hired. Q3I reasonably relied on McEvoy's advertised association with Taglich on Taglich's web site and elsewhere, as well as McEvoy's use of Taglich resources, when engaging him to serve as the fund administrator for Q3I.

23.     As Tran further confirmed, Q3I would have never hired an individual who was not working on behalf of a financial institution like Taglich to serve as the fund administrator because, among other reasons, the principals wanted the credibility and experience that such a relationship would bring. To put it another way, Q3I only hired McEvoy because it was retaining Taglich through McEvoy's engagement.

24.     McEvoy's service as the fund administrator for Q3I was within the scope of his employment with Taglich. It is of the kind of services he is employed to perform, it occurred substantially within the authorized time and space limits applicable to his employment, and was actuated, at least in part, by a purpose to

serve Taglich, including expanding McEvoy's relationships and business development opportunities to obtain new clients for Taglich and increasing McEvoy's experience to better serve Taglich's clients.

25.     McEvoy's service as a fund administrator to a fund like Q3I and his negligence in connection with that role were acts that were reasonably foreseeable by Taglich. McEvoy provided his services for Q3I on behalf of Taglich.

26.     McEvoy and Taglich were retained to manage Q3I's compliance policies and procedures to protect Q3I's limited partners, and to oversee all aspects of Q3I's fund operations. McEvoy was aware of his and Taglich's purpose as fiduciaries to protect Q3I and accepted this role on behalf of himself and Taglich.

27.     Ackerman announced McEvoy's engagement in a Third Quarter 2018 newsletter, in which he explained to existing investors that the fund administrator's responsibilities would touch on all aspects of Q3I's business to protect Q3I:

> [W]e have hired a CFA or Administrator, per regulation, to ensure our compliance, consistent due diligence, reconciliation of all transactions and funding amounts. Once he is completely up to speed, he will be invaluable with making sure we can concentrate on what we do best, which is maintain our strategy and take as much profit from the marketplace that we can.

28.     Subsequently, Q3I continued to emphasize the breadth of McEvoy's compliance responsibilities. For example, Q3I informed one cryptocurrency exchange, with McEvoy's approval, that McEvoy was responsible for the fund's

compliance with relevant Anti-Money Laundering ("AML") and Know Your Customer ("KYC") rules and regulations. This meant that McEvoy had to ensure that Q3I: (1) had an AML Compliance Officer; (2) conducted KYC due diligence on the fund's investors and managers; (3) had a document retention policy; and (4) had "[o]ngoing monitoring designed to identify, detect, and report suspicious activity and/or suspicious behavior". Similarly, in an August 2019 communication with a potential investor, Tran explained that "[w]e do not have an independent auditor. We self audit via fund administrator and accountant."

29.    McEvoy was suited to this key role because it is consistent with the work that he performed for Taglich. McEvoy worked for over eight years for Taglich as a member of its private equity investment team. Taglich Brothers is FINRA-regulated brokerage firm. According to its website, Taglich Brothers is "a full service brokerage firm … [that] has been managing the interests of thousands of clients for over ten years" and "[o]ur clients benefit from the advice of our experienced team of Registered Representatives."

30.    Although Taglich recently informed Plaintiff that McEvoy is no longer employed by Taglich, during the time period at issue, it held McEvoy out as one of eight employees of the firm on both its website and in its marketing materials. McEvoy was identified as being part of Taglich Private Equity's "Investment Team"

and as specializing "in evaluating and executing new investments, monitoring existing investments and portfolio company divestitures."

31.　　As a registered broker-dealer, Taglich Brothers is required to comply with FINRA's rules, including Rule 3270, which covers the conduct of outside business activities. According to this Rule, a registered person such as McEvoy must disclose any outside business activities to his or her employer. This requirement exists, among other reasons, to ensure that the registered person is not perceived by customers as conducting those business activities on behalf of the firm:

> During your association with a firm you may not be an employee, independent contractor, sole proprietor, officer, director or partner of another person as a result of any business activity outside the scope of the relationship with your firm, unless you have provided prior written notice to your firm pursuant to FINRA Rule 3270. *Accordingly, you should discuss with your supervisor any offer to work part-time or off-hours with any other business concern or receipt of any form of compensation from a source other than your firm. Your firm must evaluate your proposed outside business activities to determine whether to impose conditions, limit or even prohibit your proposed activity because such activity may interfere with your role at the firm or be perceived by customers as part of the firm's business.*

> (Emphasis added).

32.　　Consistent with Rule 3270, on information and belief, Taglich Brothers was informed of and approved McEvoy's work for Q3I.

33.     Documents produced in a companion case also demonstrate that McEvoy used his Taglich email account to perform services for Q3I. McEvoy was plainly not concealing his external business activities from his employer because those emails could have been found in any type of standard compliance review.

34.     Given the overlap in management between Taglich Brothers and Taglich Private Equity, the latter entity was, on information and belief, also aware that McEvoy was serving as Q3I's fund administrator.

35.     However, neither Taglich Brothers nor Taglich Private Equity heeded FINRA's warning about the risks associated with outside business activities. They failed to add disclaimers to their websites or marketing materials to inform the investing public that McEvoy engaged in work outside of the scope of his employment for Taglich. Accordingly, they cloaked McEvoy in the outward appearance of working on behalf of Taglich whenever he functioned as a finance professional within the scope of his employment with Taglich, including in his role as Q3I's fund administrator.

36.     Following McEvoy's retention, Q3I distributed a Private Placement Memorandum (the "PPM"), a Limited Partnership Agreement, and a Subscription Agreement (collectively, the "Investment Documents"). McEvoy worked hand-in-hand with the attorneys retained by the club participants in creating the Investment Documents. McEvoy reviewed draft versions of the Investment Documents and

provided feedback and recommendations about additional provisions to include in the Investment Documents to comply with regulations. On information and belief, McEvoy also coordinated between Q3I and outside attorneys on behalf of Q3I to ensure compliance with regulations, to provide opinions that would quash red flags raised by the bank that provided Q3I's fiduciary account, and to further establish Q3I's purported legitimacy as an investment trading opportunity.

37.     The PPM represented that Q3I was seeking no more than 100 investors and $15 million in investor contributions. According to the PPM, participants could purchase limited partnership interests in Q3I, and Q3I would use investor funds to invest in cryptocurrencies using "proprietary high velocity trading software in a methodically risk mitigating fashion …."

38.     The PPM also represented that over the course of the prior two years, the members of the general partner had "successfully traded various crypto currencies through various crypto exchanges using proprietary algorithmically driven software for other pooled investment groups."

39.     It also provided that trading profits generated by Q3I would be divided evenly, with 50% going to the general partner and 50% going to the limited partners.

40.     The PPM explicitly referenced McEvoy's role: "[t]he Partnership's administrative services will be provided by an administrator to be engaged by the GP in the near future….   Persons interested in subscribing for Interests will be

furnished and will be required to complete and return to the GP and Administrator, subscription documents." The fact that new Q3I limited partners had to be approved by McEvoy demonstrates the degree of discretion accorded to him as the fund administrator in managing compliance.

41.     By December 2019, more than 150 limited partners located throughout the United States had deposited more than $33 million with Q3I.

42.     McEvoy had full knowledge of Q3I's stated purpose and strategy, which was supposed to be high frequency trading of cryptocurrencies using a proprietary algorithm.

43.     McEvoy (and Taglich through McEvoy) had authority to demand access to and view the exchange accounts and the actual movement of money, which, as reflected below, was transferred through the Signature Bank fiduciary account directly into the general partner's account and then into the personal accounts of the members of the general partner.



44.     In an email from Seijas to Signature Bank after its compliance department started asking questions about the "movement of funds," Seijas represented that Q3I had "cleared it with our fund administrator[,] Mr. McEvoy." McEvoy informed Seijas that he cleared the movement of funds with a law firm he retained to provide legal advice to Q3I, Polsinelli, though Polsinelli has denied this.

45.     McEvoy and Taglich failed to protect Q3I, conduct diligence, ensure Ackerman's compliance with the Investment Documents, or reconcile Q3I's transactions and funding amounts.

46.     If McEvoy had performed the duties to Q3I he accepted, he would have verified the balance of the cryptocurrency held in the exchanges by Q3I, among other basic steps to protect Q3I, and thus would have known immediately that Ackerman was falsifying the claimed returns, and that the representations made by Ackerman in the Investment Documents that he helped create and promote were untrue. This would have stopped the scheme before most of the $38 million in funds deposited into Q3I was stolen.

47.     Taglich is liable for the conduct of its employee and agent McEvoy under theories of respondeat superior for McEvoy's conduct committed within the scope of his employment, or vicarious liability of a principal for its agent's conduct committed within the scope of the agency, and apparent authority or agency.

48.     All conditions precedent to the maintenance of this action have been satisfied, have occurred, or have been waived.

## COUNT I – BREACH OF FIDUCIARY DUTY

49.     Plaintiff incorporates paragraphs 1 through 48 as if fully set forth herein.

50.     As fund administrator for Q3I tasked with the obligations to protect Q3I from the unscrupulous conduct of persons with access to the fund, McEvoy and Taglich owed fiduciary duties to Q3I. Alternatively, McEvoy and Taglich owed fiduciary duties to Q3I because of the trust placed in them by Q3I with their consent and knowledge.

51.     McEvoy and Taglich breached their fiduciary duties by shirking their responsibilities as fund administrator for Q3I, as described above, which includes but is not limited to: (1) never attempting to verify the purported gains of 15% or more in monthly compounded profits by accessing the crypto exchange accounts or otherwise confirming with the exchanges; (2) allowing a portion of the funds to be sent to Q3I limited partners under the guise of profit distributions, when minimally competent monitoring of the accounts would have clearly shown that only about $1.5 million was ever sent to the Q3I fiduciary account from a cryptocurrency exchange; (3) willfully ignoring that only about $3.3 million of the $38 million invested was ever sent from the Q3I fiduciary account to a cryptocurrency exchange; and (4)

turning a blind eye to the millions of dollars of funds being transferred to the general partner's bank account and subsequently to the personal bank accounts of Ackerman, Tran, and Seijas, and doing nothing to investigate or stop Ackerman's scheme, despite clear red flags.

52.     Q3I suffered damages that were the direct result and proximate cause of McEvoy's and Taglich's breaches of their fiduciary duties. But for their acts and omissions, McEvoy and Taglich could have prevented Q3I's damages, which were one of their primary obligations as fund administrator.

WHEREFORE, Plaintiff respectfully demands full and final judgment against Defendants, awarding damages together with interest on the judgment at the proper legal rate, plus litigation costs, expenses, and reasonable attorneys' fees to the extent permitted by law or contract, as well as punitive damages, and for such other relief to which Plaintiff may be rightly entitled.

## COUNT II – GROSS NEGLIGENCE

53.     Plaintiff incorporates the allegations in paragraphs 1 through 48 as if fully set forth herein.

54.     Becoming a Chartered Financial Analyst requires extensive formal learning and training, licensure and regulations indicating a qualification to practice, a code of conduct imposing standards beyond those accepted in the marketplace, and a system of discipline for violation of those standards. Furthermore, as a FINRA-

regulated broker and firm, McEvoy and Taglich are subject to additional regulations, codes of ethics, and discipline for failure to comply with professional and financial industry standards.

55.    As fund administrator of Q3I, McEvoy and Taglich owed duties of care to Q3I. McEvoy and Taglich had a professional relationship with Q3I to counsel and advise Q3I and to protect Q3I from nefarious activity by persons having access to the fund. McEvoy and Taglich were aware that their services were used for the purpose of soliciting and maintaining investments in Q3I. McEvoy and Taglich knew or should have known that Q3I relied on them to ensure Q3I's compliance, conduct due diligence, reconcile transactions and funding amounts, and ensure Q3I was legitimate and trustworthy.

56.    McEvoy and Taglich breached their duties of care to Q3I by allowing Ackerman to conduct his scheme and misappropriate millions of dollars. Specifically, McEvoy and Taglich breached their duties of care by, among other things, failing to ensure Q3I's compliance with laws and regulations, failing to conduct any due diligence of Q3I, failing to reconcile any transactions of Q3I, failing to verify the purported amounts in the Q3I cryptocurrency exchanges, failing to access the cryptocurrency exchanges to verify the purported profits being touted by Ackerman, and ignoring a multitude of red flags a reasonably competent professional would have recognized and investigated.

57.     McEvoy and Taglich acted/omitted in a manner which demonstrates a reckless disregard of the rights of Q3I when they allowed Ackerman to operate his fraudulent scheme from September 2018 through December 2019, without ever acting on or investigating the evidence of fraud, but instead blindly allowing Ackerman to continue his scheme under his watch. Had McEvoy or Taglich conducted any reasonable investigation into the Q3I fiduciary account transactions, they would have immediately recognized the fraud. Instead, McEvoy and Taglich willfully and recklessly ignored misappropriation of funds, and their actions/omissions border on intentional wrongdoing.

58.     As a direct and proximate result of McEvoy's and Taglich's gross negligence, millions of dollars were improperly diverted. But for their gross negligence, Q3I's damages would have been prevented.

WHEREFORE, Plaintiff respectfully demands full and final judgment against Defendants, awarding damages together with interest on the judgment at the proper legal rate, plus litigation costs, expenses, and reasonable attorneys' fees to the extent permitted by law or contract, as well as punitive damages, and for such other relief to which Plaintiff may be rightly entitled.

## COUNT III – COMMON LAW NEGLIGENCE

59.     Plaintiff incorporates the allegations in paragraphs 1 through 48 as if fully set forth herein.

60.    Becoming a Chartered Financial Analyst requires extensive formal learning and training, licensure and regulations indicating a qualification to practice, a code of conduct imposing standards beyond those accepted in the marketplace, and a system of discipline for violation of those standards. Furthermore, as a FINRA-regulated broker and firm, McEvoy and Taglich are subject to additional regulations, codes of ethics, and discipline for failure to comply with professional and financial industry standards.

61.    As fund administrator of Q3I, McEvoy and Taglich owed duties of care to Q3I. McEvoy and Taglich had a professional relationship with Q3I to counsel and advise Q3I and to protect Q3I from nefarious activity by persons having access to the fund. McEvoy and Taglich were aware that their services were used for the purpose of soliciting and maintaining investments in Q3I. McEvoy and Taglich knew or should have known that Q3I relied on them to ensure Q3I's compliance, conduct due diligence, reconcile transactions and funding amounts, and ensure Q3I was legitimate and trustworthy.

62.    McEvoy and Taglich breached their duties of care to Q3I by allowing Ackerman to conduct his scheme and misappropriate millions of dollars. Specifically, McEvoy and Taglich breached their duties of care by, among other things, failing to ensure Q3I's compliance with laws and regulations, failing to conduct any due diligence of Q3I, failing to reconcile any transactions of Q3I, failing

to verify the purported amounts in the Q3I cryptocurrency exchanges, failing to access the cryptocurrency exchanges to verify the purported profits being touted by Ackerman, and ignoring a multitude of red flags a reasonably competent professional would have recognized and investigated.

63.     As a direct and proximate result of McEvoy's and Taglich's negligence, millions of dollars were improperly diverted. But for their negligence, Q3I's damaged would have been prevented.

WHEREFORE, Plaintiff respectfully demands full and final judgment against Defendants, awarding damages together with interest on the judgment at the proper legal rate, plus litigation costs, expenses, and reasonable attorneys' fees to the extent permitted by law or contract, and for such other relief to which Plaintiff may be rightly entitled.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated: July 5, 2022

*/s/ Paul Thanasides*
Paul Thanasides
Florida Bar No.: 103039
paul@mcintyrefirm.com
complexlit@mcintyrefirm.com
Garrett Severson
Florida Bar No. 108259
garrett@mcintyrefirm.com
clservice@mcintyrefirm.com
Jorge Callaos

Florida Bar No.: 1020500
jcallaos@mcintyrefirm.com
Abood Shebib
Florida Bar No. 102838
ashebib@mcintyrefirm.com
McIntyre Thanasides Bringgold Elliott
   Grimaldi Guito & Matthews, P.A.
500 E. Kennedy Blvd., Suite 200
Tampa, FL 35602
Telephone: 813.223.0000
Facsimile: 813.225.1221
***Counsel for Plaintiffs***